IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTIRCT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 0:22-cv-61147-WPD

DR. TERRY RZEPKOSKI and KRISTEN
ASSELTA, on behalf of the Nova
Southeastern University 401(k) Plan,
individually and as a representative of a
class of participants and beneficiaries,

       Plaintiffs,

vs.

NOVA  SOUTHEASTERN UNIVERSITY,
INC.,

       Defendant.

## FIRST AMENDED CLASS ACTION COMPLAINT

On behalf of the Nova Southeastern University 401(k) Plan ("Plan"), Dr. Terry Rzepkoski and Kristen Asselta ("Plaintiffs"), file this First Amended Class Action Complaint against Defendant Nova Southeastern University, Inc. ("University" or "Defendant"), for breaching its fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.    The University offers a retirement plan to its employees under 26 U.S.C. § 401(k). Eligible faculty and staff members may elect to participate in the Plan, which provides the primary source of retirement income for many former employees.  The Named Plaintiffs are each Plan participants.  At the end of 2021, the Plan 6,333 participants with account balances as of the end of the plan year and $437,422,981 million in assets.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.      In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound, resulting in significant differences in the amount of savings available at retirement. As the Supreme Court has explained,

"[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

6.      The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).

7.      At the end of 2021, the Plan 6,333 participants with account balances as of the end of the plan year and $437,422,981 million in assets.  Accordingly, the Plan has substantial bargaining power regarding the fees and expenses that are charged against participants' investments. However, instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendant chose poorly performing investments, inappropriate, high cost, actively managed mutual funds and caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

8.      However, to the extent that Defendant made any attempt to reduce the Plan's expenses or to prudently monitor and review the Plan's investment options, Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that each investment option that was offered in the Plan was prudent.

9.      Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

**JURISDICTION AND VENUE**

10.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

11.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where the Defendant resides.

**THE PLAN**

12.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

13.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

14.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

15.     Eligible faculty and staff members of the University are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many University employees.  The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by Defendant.

16.     In theory, Defendant determines the appropriateness of the Plan's investment offerings, monitors investment performance, and reviews total plan and fund costs each year.

## THE PARTIES

### *Plaintiffs & Standing*

17.     Plaintiff Dr. Terry Rzepkoski is a current participant in the Plan under 29 U.S.C. §1002(7) because he has an individual account in the Plan. He was subject to the ERISA breaches of fiduciary duty described herein.

18.     Plaintiff Kristen Asselta is a participant in the Plan under 29 U.S.C. §1002(7) because she has an individual account in the Plan. She was subject to the ERISA breaches of fiduciary duty described herein.

19.     In terms of standing, §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. Here the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

20.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

21.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

22.     To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendant's unlawful conduct.

- 5 -

23.     To establish standing, the Plaintiffs need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiffs allege such an injury for each claim.

24.     For example, the Plaintiffs have standing because the challenged conduct, including Defendant's actions resulting in Plaintiffs and the class members paying excessive recordkeeping and administrative fees, affected all Plan participants in the same way.

25.     Moreover, the Plaintiffs' individual accounts in the Plan were harmed because they invested in investment options that would have been removed from the Plan had Defendant discharged its fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

26.     As a result of Defendant's actions, the Plaintiffs and class members are entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

### ***Defendant***

27.     Defendant is a private, not-for-profit, nonsectarian university with its principal place of business in Fort Lauderdale, Florida.

28.     Defendant offers two retirement plans to eligible employees: a 401(k) Plan and a 403(b) plan. Both Plans are defined-contribution plans. In such plans, participating employees maintain individual investment accounts, which are funded by pretax contributions from the employees' salaries and, where applicable, matching contributions from the employer. Each participant chooses how to invest his or her funds, subject to an important limitation: Participants may choose only from the menu of options selected by Defendant.

29.     The performance of chosen investments, as well as the deduction of any associated fees, determines the amount of money the participant will have saved for retirement.

30.     Defendant is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i), and upon information and belief, with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

31.     Defendant is a fiduciary to the Plan because it exercised discretionary authority and discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

## **CLASS ACTION ALLEGATIONS**

32.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[1]

> All persons, except Defendant and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 15, 2016, and the present (the "Class Period").

33.     The members of the Class are so numerous that joining all members is impractical. According to the 2021 Form 5500 filed with the U.S. Department of Labor by Defendant, at the end of 2021 the Plan 6,333 participants with account balances and                    $437,422,981 million in assets.

---

[1] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

34. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries because of Defendant's mismanagement of the Plan. Defendant treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

35. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendant is a fiduciary of the Plan;

    B.    Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;

    C.    Whether Defendant failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of relief.

36. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

37. This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate

actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

38.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANT'S FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES**

39.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

40.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

41.     As described above, Defendant was a fiduciary of the Plan because:

    A.     it was so named; and/or

    B.     it exercised authority or control respecting management or disposition of the Plan's assets; and/or

    C.     it exercised discretionary authority or discretionary control respecting management of the Plan; and/or

    D.     it had discretionary authority or discretionary responsibility in the administration of the Plan.

42.     As fiduciaries, Defendant is/are required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

43.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

44.     "Thus, in deciding whether and to what extent to invest in a particular investment, ***a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income***. A decision to make an investment may not be influenced by non-economic factors unless the investment, ***when judged solely on the basis of its economic value to the plan***, would be equal or superior to alternative investments available to

the plan." *U.S. Dep't of Labor ERISA Adv. Op*. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

45.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

46.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

47.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his

specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

48.     During the Class Period, Defendant did not act prudently or in the best interests of the Plan's participants. Investment options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many investment options that were more expensive than necessary and otherwise were not justified based on their economic value to the Plan.

49.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendant failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for each of the Plan's investment options. Additionally, Defendant failed to leverage the size of the Plan to negotiate the lowest expense ratio available for certain investment options maintained and/or added to the Plan during the Class Period. Defendant also caused the Plan and its participants to pay excessive administration fees and excessive compensation to service providers.

50.     As set forth in detail below, Defendant breached fiduciary duties to the Plan and its participants and beneficiaries and is therefore liable for its breaches and the breaches of its co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

51.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing

strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

52.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

53.     Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

54.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[3] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

---

[2] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited June 14, 2022).
[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited June 14, 2022).

55.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

56.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[4] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

57.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from services like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[5]

58.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigating

---

[4] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited June 14, 2022).
[5] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited June 14, 2022).

alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

### *Defendant Breached Its Fiduciary Duties by Causing the Plan to Select High-Cost, Actively Managed Funds*

59.     Throughout the Class Period, the Plan's investment options have been dominated by high cost, actively managed funds, despite the fact that these funds charged grossly excessive fees compared with alternative funds that used the same investment style, and despite ample evidence available to a reasonable fiduciary that such funds had become imprudent due to their high costs.

60.     Importantly, during the entire Class Period, **all** of the funds offered through the Plan were issued by the parties two recordkeepers, TIAA and VALIC (acquired by and now operating as AIG). TIAA and VALIC receive compensation from investments made by Plan participants through the Plan. For most of the Class Period, Defendant allowed TIAA and VALIC to freight the Plan's entire investment menu with investments that generate excessive fees for TIAA and VALIC at the direct expense of Plan participants.

61.     For example, Plan participants currently have more than $98 million invested through the Plan in the TIAA Lifecycle target date funds, including Named Plaintiff Dr. Terry Rzepkoski, who was initially invested in the TIAA-CREF Lifecyle Fund 2020 via the Qualified Default Investment Alternative because he did not specify how he wanted his contributions invested.  His funds were later moved by Defendant to the TIAA-CREF Lifecycle 2020 Institutional active fund in 2016, then, in 2022, to the TIAA-CREF Index Lifecycle 2020 fund—a passive fund.

62.     Prior to 2022, Defendant designated the TIAA Lifecycle funds as the Qualified Default Investment Alternative for the Plan. That means that Plan participants, like Named

Plaintiff Dr. Terry Rzepkosk, who did not elect how contributions to their Plan accounts should be allocated will have contributions automatically invested in the TIAA Lifecycle funds. The Lifecycle funds, however, are expensive and poorly performing active funds relative to virtually identical funds available throughout the market from many investment companies.  The table below provides, for illustration purposes, a small sample of less expensive and better performing alternatives to the Lifecycle funds.

| Current Target Date Fund | Net Expense Ratio | Comparable Target Date Funds | Net Expense Ratio |
|---|---|---|---|
| TCWIX Lifecycle 2025 | .39% | VRIVX Vanguard Trgt 2025 | .09% |
| | | FQIFX Fidelity Freedom 2025 | .012% |
| | | LINKX BlackRock LifePath 2025 | .09% |
| TCRIX Lifecycle 2030 | .42% | VTTWX Vanguard Trgt 2030 | .09% |
| | | FQIFX Fidelity Freedom 2030 | .12% |
| | | LIBKX BlackRock LifePath 2030 | .09% |
| TCIIX Lifecycle 2035 | .43% | VITFX Vanguard Trgt 2035 | .09% |
| | | FIHFX Fidelity Freedom 2035 | .12% |
| | | LIJKX BlackRock LifePath 2035 | .09% |
| TCOIX Lifecycle 2040 | .44% | VIRSX Vanguard Trgt 2040 | .09% |
| | | FBIFX | .12% |

| Current Target Date Fund | Net Expense Ratio | Comparable Target Date Funds | Net Expense Ratio |
|---|---|---|---|
| | | Fidelity Freedom 2040 | |
| | | LIKKX<br>BlackRock LifePath 2040 | .09% |
| TIFIX<br>Lifecycle 2045 | .45% | VTIVX<br>Vanguard Trgt 2045 | .08% |
| | | FIOX<br>Fidelity Freedom 2045 | .12% |
| | | LIHIX<br>BlackRock LifePath 2045 | .14% |
| TFIX<br>Lifecycle 2050 | .45% | VFIFX<br>Vanguard Trgt 2050 | .08% |
| | | FIPFX<br>Fidelity Freedom 2050 | .12% |
| | | LIPKX<br>BlackRock LifePath 2050 | .09% |
| TTRIX<br>Lifecycle 2055 | .45% | VFFVX<br>Vanguard Trgt 2055 | .08% |
| | | FFLDX<br>Fidelity Freedom 2055 | .08% |
| | | LIVKX<br>BlackRock LifePath 2055 | .09% |
| TLXNX<br>Lifecycle 2060 | .45% | VTTSX<br>Vanguard Trgt 2060 | .08% |
| | | FDKLX<br>Fidelity Freedom 2060 | .012% |
| | | LEIZIX<br>BlackRock LifePath 2060 | .25% |

63.     As noted above, these examples are illustrative and not exhaustive.

64.     It was not until late 2021 and/or early 2022 that Defendant finally made the decision to transfer from the TIAA Lifecycle Institutional funds, which were actively managed funds, to the TIAA Index Lifecycle funds, which are passively managed funds, as the QDIA in the Plan.

65.     Thus, it needlessly took Defendant about five (5) years to make this critical switch, and not before the Plan had overpaid hundreds of thousands, if not millions, in excessive fees charged by the actively managed TIAA Lifecycle Institutional funds.  With respect to the high-risk nature of the active funds, the Lifecycle funds subject Plan assets to significantly more risk than the Index suite.

66.     Although active funds like the Lifecycle Institutional funds may experience success over shorter periods, they are more expensive and rarely outperform the market.  Simply put, it should not have taken Defendant five years to make the switch from an actively managed to passively managed suite for its QDIA.

67.     In sum, Defendant's decision to wait more than five years to switch the QDIA from the TIAA Lifecycle Institutional actively managed target date fund suite to the TIAA Index Lifecycle funds (passively managed funds), as the QDIA in the Plan, needlessly cost the Plan hundreds of thousands, if not millions, in losses.

68.     Both the market data and the Committee's Decision further support Plaintiffs' allegations regarding Defendant's imprudence and fiduciary duty breaches for causing the Plan to offer the TIAA Index Lifecycle funds as the QDIA from 2016 through September of 2021.  A prudent fiduciary under the circumstances would not have included the Lifecycle funds in the Plan. Based on information and belief, the only logical reason they were included in the Plan is because

TIAA is a recordkeeper for the Plan and Defendant allowed TIAA to include its Lifecycle funds on the Plan's menu of investments to benefit TIAA and to the detriment of Plan participants.

69. Notably, in 2020, Defendant included the Vanguard target date on the Plan's investment menu too. This is a tacit admission that the Vanguard funds are lower cost and better performing funds than the TIAA Lifecycle funds – but importantly, Defendant failed to remove the Lifecycle funds from the Plan's menu of investments. There is no legitimate reason why Defendant ought to include multiple sets of the same types of funds on the Plan menu of investment options. This is especially so here when the Lifecycle funds are more expensive and perform poorly as compared to the Vanguard funds. Defendant violated its duty to monitor and remove imprudent funds from the Plan's investment menu.

70. In addition, Defendant created and is governed by an Investment Policy Statement ("IPS") for the Plan. The IPS provides that it was created to "help" Defendant comply with ERISA. The IPS provides that expense ratios for investments offered by the Plan should fall below the average expense ratio for an investments peer group. Many of the investments offered in the Plan contain expense ratios that exceed the investments peer group. The IPS provides that each investment offered by the Plan must fulfill a specific part of the Plans' overall investment lineup. However, the Plan's investment menu is freighted with duplicative investments that do not fulfill a specific part of the Plan's investment lineup. Rather, Defendant has allowed investments from the same style and consistency to be offered by TIAA and VALIC throughout the Class Period. It appears Defendant made no legitimate effort to comply with ERISA or its IPS and has simply allowed TIAA and VALIC to freight the Plan menu with investments that serve TIAA and VALIC but not Plan participants.

71. In addition, the IPS requires that all actively managements investments offered by the Plan rank in the top 50% of their given peer group for the 3 or 5 year annualized period. Defendant has failed to comply with this aspect of the IPS too. For example, as of December 31, 2020, there was roughly $13 million invested through the Plan in the American Pacific Growth Fund (the fund appears twice on the Plan menu of investments and is offered through the Plan by TIAA and VALIC – this is a separate violation of the IPS and Defendant's duty of prudence). This fund has returned -19.38 percent of the past year. That is, the fund was losing money. The fund is ranked 66 in its peer group over the past year. This example is illustrative and not exhaustive. Many of the funds offered through the Plan underperform.

72. Prudent fiduciaries of plans must regularly analyze the Plan's investment options to determine whether its actively managed funds will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to continue to offer that specific actively managed option for the particular investment style and asset class.

73. Defendant failed to undertake such an analysis when it selected and retained funds for the Plan. That is plainly evident given the duplication of funds offered through the Plan. This is also apparent given the myriad of actively managed funds offered through the Plan. Defendant provided these fund options without conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers' net of fees over the long-term.

74. Defendant's failure to remove consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plan's investment offerings. Had Defendant adopted prudent processes in order to discharge its fiduciary duties, funds would have

been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted - in which case the funds should have been removed - or whether the underperformance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

### *Defendant Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses*

75.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond the simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

76.     Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans can customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

77.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

78.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by

negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

79.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

80.     Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiffs are not making a claim against Defendant for using revenue sharing to pay recordkeeping fees.

81.     However, when revenue sharing is left unchecked, it can be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees."[6]

82.     Because revenue sharing payments are asset based, they bear no relation to a reasonable recordkeeping fee and can provide excessive compensation. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increase the recordkeeping fees that

---

[6] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited June 14, 2022).

Capital Research pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

83.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

84.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

85.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect"

compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

86.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

87.     More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

88.     More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar

plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

89.     Here Defendant failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to the Plan's recordkeeper by failing to undertake any of the aforementioned steps.

90.     Defendant failed to undertake an RFP from at least 2013 through 2021, ***or at least an eight-year period***. If Defendant had undertaken an RFP to compare its two recordkeepers' collective costs with those of others in the marketplace, Defendant would have recognized its dual recordkeepers compensation for recordkeeping services during the Class Period has been (and remains) unreasonable and excessive.

91.     TIAA and VALIC were the Plan's recordkeepers during most of the Class Period, although VALIC was eventually dismissed. By needlessly doubling the number of recordkeepers, Defendant caused the Plan to incur significant—and excessive—fees. The use of a single recordkeeper is less confusing to participants and avoids excessive recordkeeping fees charged to the Plans. Vendor Consolidation in Higher Education: Getting More from Less, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[7]

---

[7] Available at http://www.plansponsor.com/vendor-consolidation-in-higher education/?fullstory=true.

92.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendant continue to contract with two different recordkeepers, TIAA and VALIC, until after Plaintiffs contacted Defendant via their § 1024(b)(4) request for information until it opted to fire VALIC, leaving TIAA as the only Plan recordkeeper.

93.     The inefficient and costly decision by Defendant to utilize multiple recordkeepers has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services.

94.     From 2015 to 2021 the direct annual recordkeeping per participant compensation that TIAA and VALIC received from Plan participants were/was as follows:

| Year | Direct Recordkeeping Compensation |
|------|-----------------------------------|
| 2015 | $56.12 |
| 2016 | $28.90 |
| 2017 | $54.18 |
| 2018 | $64.91 |
| 2019 | $62.80 |
| 2020 | $57.29 |
| 2021 | $72.13 |

95.     By comparison to other plans, the recordkeeping fees are excessive and unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan), and demonstrated that as plans increase in size the costs of recordkeeping generally decrease

on a per participant basis—a classic example of economies of scale. But here the opposite is happening. As Plan assets increase so are recordkeeping fees.

96.     A plan with 200 participants and $20 million in assets, the average recordkeeping and administration cost (through direct compensation) is $12 per participant. 401k Averages Book at 95. A plan with 2,000 participants and $200 million in assets, the average recordkeeping and administration cost (through direct compensation) is $5 per participant. *Id*. at 108. Defendant caused Plan participants to pay excessive fees.

97.     Moreover, TIAA and VALIC did not receive only the direct compensation set forth above—they received far more compensation for recordkeeping and other administrative services through revenue sharing payments. Such revenue sharing payments are particularly problematic because they are asset-based, and they usually bear no relation to a reasonable recordkeeping fee. Rather, in large plans, like this one, revenue sharing often results in excessive compensation, especially here, when high-priced funds are included as plan investment options.

98.     As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

99.     Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing

is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014).[8] Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id.*

100.    As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan. Indeed, in May 2014, AllianceBernstein advised: "DC plans and their fiduciaries may be better served to modify or change the plan design a bit, and it might be wise to consider removing excess revenue sharing from the picture altogether. One route to that solution would be to consider share classes or investment vehicles with lower—or no—revenue-sharing rates." Daniel Noto, *Rethinking Revenue Sharing*, AllianceBernstein (May 2014).[9]

101.    The Plan's total expenses for recordkeeping reveal the true extent of Defendant's fiduciary breaches. The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $150 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually.

---

[8] Available at: https://blog.alliancebernstein.com/post/en/2014/06/coming-to-grips-with-excess-revenue-sharing (last visited June 14, 2022).

[9] Available at: https://www.alliancebernstein.com/Research-Publications/CMA-created-content/Institutional/Instrumentation/DC_RethinkingRevenueSharing.pdf (last visited June 14, 2022).

102.     Notably, in 2021, Dr. Rzepkoski's last quarterly statement lists his fees and expenses paid to TIAA for the year at $75.32.

103.     As noted above, some plans pay recordkeepers fees in addition to direct compensation in the form of revenue sharing. Here, the Plan paid TIAA and VALIC a fortune in direct and indirect compensation for recordkeeping services throughout the Class Period.

104.     The recordkeeping fees are far greater than recognized reasonable rates for a plan with more than $400 million in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by TIAA and VALIC. TIAA and VALIC perform tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping and information management (computing, tabulating, data processing, etc.)

105.     Looking at recordkeeping costs for other University plans of similar size shows that the Plan was paying higher recordkeeping fees than its peers by at 4 times – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.   The chart below analyzes the most recent available information, as included in the most recent 5500 form filed with the DOL, as to plans comparator plans for benchmarking purposes:

| Name of Plan / Year of Plan | Number of participants with account balances as of the end of the plan year | Value of Plan Assets | Total Reported Direct Record-keeping and Admin-Costs | Annual Record-keeping and Admin Costs Per-Participant[10] | Name of Recordkeeper |
|---|---|---|---|---|---|
| Nova University 401(k) Plan | 6,333 participants | $437,422,981 | $456,821 | $72.13 | TIAA/VALIC |
| Tulane University Tax Deferral 403(B) Retirement Plan | 4,580 participants | $405,963,532 | $52,408 | $11.44 | TIAA |
| Loma Linda University Retirement Plan | 6,591 participants | $599,387,943 | $33,555 | $5.09 | TRowe Price |
| University of Dayton Tax Deferred Annuity Plan | 5,031 participants | $620,918,398 | $10,541 | $2.09 | TIAA |
| The Catholic University Retirement Plan | 3,462 participants | $580,197,051 | $6,362 | $1.83 | TIAA |

106.    The services that TIAA and VALIC provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action. Defendant's failure to monitor and control recordkeeping compensation

---

[10] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2021) at pg. 27 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf.

cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

**FIRST CLAIM FOR RELIEF**
*Breaches of Fiduciary Duties of Prudence*

107.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

108.    As a fiduciary of the Plan, Defendant was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

109.    Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants and consistent with the ISP. Instead, Defendant selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Defendant also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, Defendant failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

110.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered

these losses, and Plan participants would have had more money available to them for their retirement.

111.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### *Failure to Adequately Monitor Other Fiduciaries and Service Providers*

112.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

113.    Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Defendant is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

114.    Given that Defendant had the overall responsibility for the oversight of the Plan, Defendant had a fiduciary responsibility to monitor the performance of the other fiduciaries and service providers, including those delegated fiduciary responsibility to administer and manage Plan assets.

- 32 -

115.    A monitoring fiduciary must ensure that its monitored fiduciaries and service providers are performing their obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

116.    Defendant breached its fiduciary monitoring duties by, among other things:

a.    Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses because of its appointees' imprudent actions and omissions with respect to the Plan;

b.    Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.    Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.    Failing to ensure that the monitored fiduciaries and service providers considered the ready availability of comparable and better performing investment options that

charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

e. Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

117. Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class Members lost millions of dollars of retirement savings.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1. Find and declare that the Defendant has breached its fiduciary duties as described above;

2. Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4. Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5. Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.  Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.  Reform the Plan to include only prudent investments;

8.  Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

9.  Certify the Class, appoint the Plaintiffs as class representatives, and appoint their counsel as Class Counsel;

10. Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11. Order the payment of interest to the extent it is allowed by law; and

12. Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 5th day of May, 2023.

Respectfully submitted,

 /s/ Brandon J. Hill
**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA, P.A.**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: **0285020**
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: gdesane@wfclaw.com

- 35 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of May, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Brandon J. Hill
BRANDON J. HILL
